IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DEBORAH GARRETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-00148-CV-W-HFS |
| ) | |
| LEE'S SUMMIT HEALTH CARE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

Defendant, Lee's Summit Hospital, has filed a motion for summary judgment seeking dismissal of this action. Plaintiff, Deborah Garrett, filed suit alleging race discrimination and retaliatory discharge in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the Missouri Human Rights Act ("MHRA")[1].

**Background Facts**

Plaintiff, an African-American, is a Registered Nurse ("RN") with 21 years of experience. She commenced employment with defendant in December of 2002, and worked a 12 hour shift, 3 days a week, from 7:00 a.m. until 7:00 p.m. Plaintiff worked on the second floor which housed the Medical/Surgical unit. Lynn Barrett is the Chief Nursing Officer and has overall responsibility for

---

[1] Plaintiff subsequently acknowledged her failure to file her claims under Title VII within 90 days from receipt of her right-to-sue letter, thus, she withdrew all claims, with the exception of those filed pursuant to § 1981.

the RNs; Keith Raihala was the Floor Manager and had overall responsibility for the unit; Charge Nurses supervised the floor RNs.

Defendant maintained strict policies and procedures on the administration and charting of medication dispensed to patients. Toward this end, defendant required the completion of three records for the administration of narcotics. First, when an RN obtains narcotics from a locked medication cart, he or she must complete the Controlled Substance Administration Record ("the Narcotic Sign-Out Sheet") which is kept at the cart, recording the patient's name, room number, dosage, as well as the RN's signature. Second, the RN must immediately document the name of the drug, the time, and the dosage on the patient's individual Medication Administration Record ("MAR"), this is part of the patient's chart. Third, as soon as possible, but no later than the end of one's shift, the RN must document the administration of medication in the RN's nursing notes, which is also part of the patient's chart, noting both the time the drug was administered, and, if different, the time the note was made.

Defendant states that all three records should be identical as it pertains to medication and time administered. Plaintiff contends that while the medications should be identical, the time administered may differ from the time the medication was removed from the cart if an intervening interruption occurs. Further, defendant states that proper procedure mandates that in the event of an error, the author must draw a line through the incorrect entry so that it is still legible, initial it, and write the correct entry on the next line. Plaintiff states that in the event of a written error, she was trained to draw a line through the error, initial it, and continue. The parties agree, however, that at the end of each shift, either an RN or Charge Nurse from the outgoing shift, together with an RN from the oncoming shift count the narcotic medications on the cart against the entries on the

2

Narcotic Sign-Out Sheet. Any discrepancy is reconciled by consulting with the RN who can show that from a MAR that a narcotic was administered but was not recorded.

On July 29, 2003, after plaintiff's shift ended, the evening Charge Nurse, Patty Putnam, spoke with one of plaintiff's patients, Patient A. According to Putnam, Patient A's description of the pain medication received varied significantly from plaintiff's Nursing Notes. Although Putnam states that Patient A was alert and oriented when speaking with her, plaintiff argues that Patient A was receiving multiple narcotics and was confused. Upon further review, Putnam noticed additional discrepancies in plaintiff's Nursing Notes, the MAR, and the Narcotic Sign-Out Sheets. For instance, Patient A reported receiving only one pain pill that day, yet, plaintiff's charts indicated that she gave Patient A four Lortab, Oxycodone, Toradol, and a shot of Morphine. Additionally, plaintiff's Nursing Notes indicated that she noted the time she administered the Morphine incorrectly, she noted that she administered the Oxycodone on the MAR before she signed it out on the Narcotic Sign-Out Sheet, and she wrote over three separate chart entries rather than crossing it out and rewriting it on the line below.

On August 5, 2003, after plaintiff left the premises, Putnam observed that plaintiff's Nursing Notes indicated that plaintiff gave Patient B a narcotic medication one hour before the same Notes reflected the doctor's order of the medication for the patient. Upon finding this discrepancy, Putnam then reviewed all records for Patient B and found revisions and discrepancies. Putnam found that plaintiff noted the administration of Oxycodone at 10:30 a.m., but noted on the Narcotic Sign-Out Sheet that it was wasted. Plaintiff also failed to record Demerol or Phenergan on the Narcotics Sign-Out Sheet. Putnam notified the Evening House Supervisor, LuAnn Maggard, who completed an incident report. The reports were then forwarded to the Chief Nursing Officer, Lynn Barrett.

3

On August 12, 2003, plaintiff met with Barrett, the Floor Manager, Keith Raihala, and the Human Resources Director, Portia Grubb, to discuss alleged narcotic medication charting discrepancies. Putnam was not a participant. Plaintiff was suspended pending investigation, and on August 14, 2003, Barrett, Raihala, and Grubb met with plaintiff and terminated her employment due to a lack of conscientious attention to duty and services based on inconsistent documentation on hospital records.

## Analysis

### A. Summary Judgment Standard of Review

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. Davidson v. Tyco/Healthcare, Mallinckrodt, Inc., 416 F.Supp.2d 690 (E.D.Mo. 2005). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Davidson, at 693; quoting, Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Summary judgment may be granted if all the information before the district court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Davidson, at 693. The initial burden is on the moving party, and after this burden is discharged, the nonmoving party must do more than show that there is some doubt as to the facts. Davidson, at 694. Instead, the nonmoving party bears the burden of setting forth specific

4

facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Id. The court must view the facts in a light most favorable to the nonmoving party and give that party the benefit of any inferences that logically can be drawn from those facts. Id.

Although summary judgment should seldom be granted in employment discrimination cases, it is proper in those cases wherein the plaintiff fails to establish a factual dispute on an essential element of the case. Id. For, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Id.

**B.      Race Discrimination**

Plaintiff claims the existence of direct evidence of discrimination by Putnam. Under the direct evidence paradigm, the plaintiff must present "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision."; Blackwell v. DaimlerChrysler Corp., 399 F.Supp.2d 998, 1004 (E.D.Mo. 2005); quoting, Rivers-Frison v. Southeast Mo. Com. Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998); see also, Yates v. Douglas, 255 F.3d 546, 548 (8th Cir. 2001). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Blackwell, at 1004; quoting, Griffith v. City of DesMoines, 387 F.3d 733, 736 (8th Cir. 2004). Courts have pointed to the distinction between those "[c]omments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by

5

decision makers unrelated to the decisional process." Id., quoting, Rivers-Frison, at 619. Once the plaintiff persuades a fact finder that, more likely than not, discrimination was "a motivating part in an employment decision," the burden shifts to the employer to prove that the employment decision would nevertheless have been made for legitimate, non-discriminatory reasons. Yates, at 548; quoting, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

In support of her claim of direct evidence of discrimination, plaintiff states generally that her supervisor, Putnam, treated her differently than the white RNs, and that this disparate treatment was observed by other RNs. According to plaintiff, Putnam gave her a heavier work load, sicker patients, moved her patients, and failed to assist her with IV's.[2] Plaintiff also complains that, in contravention of hospital policy (Supporting Suggestions: ¶¶ 20-21), Putnam failed to counsel or inform her about the recording discrepancies, and instead, presented a "secret report" which was used in the decision to terminate her.

Plaintiff claims that Putnam was "intimately" involved in the employment decisions taken against her, by her actions in failing to counsel plaintiff regarding the alleged discrepancies. Barrett is also complained of, for remarks made during the investigation. During the initial meeting held on August 12, 2003, to discuss the discrepancies, plaintiff was questioned about a red spot on her arm. Plaintiff requested a drug test, presumably to dispel any suspicion of drug use, and Barrett stated, "well some people sell drugs."

---

[2]There is an indication that any discriminatory conduct by Putnam began after plaintiff began engaging in union activities. If plaintiff's perception is correct, Putnam's antagonism would seem directed toward labor activity rather than race. For present purposes I will not treat this problem of proof as dispositive.

Contrary to plaintiff's contentions, the evidence proffered fails to demonstrate adequate evidence of racial discrimination in her termination. Plaintiff claims that she and other RNs noticed, observed, and talked about Putnam's purportedly discriminating behavior toward plaintiff in connection with patients. (Suggestions in Opposition: Statement of Additional Material Facts: ¶ 1-4; pg. 21). Although plaintiff states this contention in her affidavit, she provides no evidence that this opinion was held by other RNs. To the contrary, in her deposition, fellow RN, Pam Dice, expressly stated that she never heard plaintiff complain about having a heavier workload attributed to racial discrimination. (Reply Brief: Ex. CC)[3].

There is no evidence that Putnam was involved in the decision to terminate plaintiff's employment. Plaintiff has not presented evidence to dispel defendant's contention that the decision was made by Barrett, after consulting with Raihala and Grubb. Putnam's involvement appears to stem from initiating the investigation of plaintiff's entries on medical documents, and the transmittal of those findings to her supervisor, LuAnn Maggard, who in turn completed an incident report.

---

[3]Plaintiff claims that she complained of race discrimination at the hearing in which she was terminated, and defendant's failure to investigate her complaint is direct evidence of discrimination. A review of plaintiff's deposition testimony reveals her belief that Putnam made her job difficult due to her race. (Defense Ex. D-Part 6: pg. 293-95). However, as previously noted, Putnam was not involved in the decision to terminate plaintiff's employment, and there is no direct evidence of discrimination in that decision.

To the extent plaintiff relies on this contention to argue that defendant's failure to further investigate her claim is post-termination evidence of race discrimination, her argument is misplaced. The case relied upon by plaintiff involved post-termination statements made by a decision-maker. Neufeld v. Searle Laboratories, 884 F.2d 335, 340 (8th Cir. 1989). Failure to pursue a "gripe" that was not presented except in the defensive context of this case is not directly probative of a racist attitude.

It is well settled that employers have wide latitude to make business decisions and it is not within the Court's "province to decide whether that reason [for the employer's employment action] was wise, fair, or even correct, ultimately so long as it truly was the reason." Davidson, 416 F.Supp.2d at 703.

These facts are, therefore, insufficient to establish that Putnam was closely involved in the decision to terminate plaintiff. Yates, 255 F.3d at 549.

Barrett's comment was racially-neutral, and falls within the category of a statement by a decision maker unrelated to the decisional process. Yates, 255 F.3d at 549 (direct evidence of employment discrimination must have some connection to the employment relationship). Unjust suspicions about drugs, along with other claims of mistaken perceptions and faulty reasoning, tend to rebut plaintiff's theory that it was racial bias that motivated the termination.[4] Because plaintiff does not present direct evidence of racial discrimination affecting the termination the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973), will be employed to determine if a submissible circumstantial case has been developed.

Under this analysis, the plaintiff has the initial burden of establishing a prima facie case of intentional discrimination by a preponderance of the evidence. Davidson, 416 F.Supp.2d at 701. To establish a prima facie case of race discrimination, the plaintiff must show that she is a member of a protected class; she was performing her job at a level that met her employer's legitimate expectations; she suffered an adverse employment action; and there are facts that permit an inference of discrimination. Id.

Plaintiff's claim stumbles at the second step and clearly misses the fourth step in this analysis. The standard for assessing performance "is not that of the ideal employee, but rather what

---

[4]Plaintiff suspects racial stereotyping in questions about personal use of drugs, and the argumentative comment about drug dealing. She cannot make a submissible case based upon such unsupported speculation, nor can she prevail by arousing sympathy for a possible wrongful discharge. Misfortunes cannot be attributed to race without a solid evidentiary underpinning that permits cooly reasoned evaluation   As further detailed, what plaintiff presents will not carry the weight needed for her to establish a racial injustice and thus to make a jury question.

8

the employer could legitimately expect." Calder v. TCI Cablevision of Missouri, Inc., 298 F.3d 723, 729 (8th Cir. 2002). Defendant states that when a discrepancy is found, the offending RN is consulted in order to rectify the count. (Supporting Suggestions: ¶ 21). According to defendant, while this is sufficient to alert the RN of the error, verbal counseling is also typically employed. (Id). In plaintiff's case, Putnam states that she spoke with plaintiff about the need for proper documentation of narcotic medication. (Id: ¶ 24). Plaintiff 's recollection is that she was advised of a recording discrepancy on one occasion. (Defense Ex. D-Part 1, Garrett Depo.: pg. 54-55). According to plaintiff, she was not advised about the recording discrepancies occurring on July 29th and Aug. 5th, until the initial meeting held on Aug. 12th. (Id.: D-Part 2: pg. 98-99; Ex. D-Part 5: pg. 258). Conversely, Putnam testified that she instructed plaintiff on proper documentation "at least once a week." (Defense Ex. E-Part 2, Putnam Depo.: pg. 47). Yet, upon further questioning, she admitted that she did not notice a problem with plaintiff's documentation until the incident occurring on July 29th. (Id: pg. 48). Supervisor, LuAnn Maggard, testified that during the one to two month period of July and August, 2003, plaintiff had discrepancies 6 to 8 times. (Defense Ex. H, Maggard Depo.: pg. 37). Prior to these occurrences, Maggard felt compelled to speak with Lynn Barrett on two occasions regarding plaintiff's problems with documentation. (Id: pg. 50).

In support of her claim of race discrimination, plaintiff states that she received a good rating on her performance review in July of 2003, and formal written charges were not filed against her for the subsequent recording errors. (Suggestions in Opposition: pg. 5). Plaintiff contends that, for the most part, she was unaware of numerous instances of recording discrepancies, and that she was not counseled about the mistakes or advised that her job was in jeopardy. (Id). She disputes various aspects of defendant's documentation protocol, and she denies that Maggard spoke to her about

9

documentation errors. (Response to Defendant's Statement of Material Facts: ¶¶ 16-18, 25). Plaintiff admits that Putnam spoke to her about documentation several times while passing in the hallway, but the conversations were brief, and plaintiff did not consider it verbal counseling. (Suggestions in Opposition: Garrett Affidavit; ¶¶ 2, 4). Defendant's disciplinary procedures, whether formal or informal, is not for this court to decide. Calder, 298 F.3d at 729; quoting, Dorsey v. Pinnacle Automation, Inc., 278 F.3d 830, 837 (8th Cir. 2002) ("Courts do not sit as super-personnel departments to second-guess the business decisions of employers.").

Viewing the evidence in a light most favorable to plaintiff, it is fair to infer that formal counseling proceedings did not take place prior to her termination. However, it is undisputed that plaintiff failed to properly document medication received by patients, and that these deficiencies were communicated to her. Erenberg v. Methodist Hosp., 240 F.Supp.2d 1022, 1031 (D.Minn. 2003). Moreover, even though plaintiff has a significant level of experience, and has met defendant's expectations in other areas of her work performance, the record permits defendant to conclude that she was deficient in the area of proper record keeping of medications. Calder, 298 F.3d at 729; see also, Ziegler v. Beverly Enterprises-Minnesota, Inc., 133 F.3d 671 (8th Cir. 1998) (the fact that an employee meets some expectations, however, does not mean that she meets the standard if she does not meet other significant expectations). As a nurse charged with dispensing medication, including narcotic medications, proper recordation of these items is treated as an issue of the utmost importance, and is clearly a legitimate expectation of performance.

Although plaintiff's termination certainly meets the third prong of the analysis as an adverse employment action, she also fails to satisfy the fourth prong requiring a showing of facts permitting an inference of discrimination. To create an inference of racial discrimination, the plaintiff must

10

show that similarly situated employees, who are not members of the protected group, were treated differently. Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). Plaintiff alleged that white RNs were treated differently, and specifically points to Pam Dice, who was not disciplined for giving incorrect medication. (Defense Ex. D-Part 5: pg. 229-30). However, it is uncontroverted that Dice immediately announced her mistake, notified the physician, and completed an incident report, and thus was not similarly situated to plaintiff. (Supporting Suggestions: ¶ 49). Plaintiff offers no examples of employer forgiveness of lapses comparable to what was perceived in her case. Defendant also fails to cite truly similar situations, but the burden rests with plaintiff.

Even, *assuming arguendo*, plaintiff established a prima facie case of race discrimination, she has failed to produce evidence sufficient to raise an issue of material fact on whether defendant's proffered non-discriminatory reason for firing her was pretextual[5]. Once a plaintiff makes a prima facie showing, the burden shifts to defendant to "produce evidence that the plaintiff was rejected, or someone else was preferred , for a legitimate, nondiscriminatory reason." Erenberg, 240 F.Supp.2d at 1032; quoting, Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. Id.; citing, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). Defendant has met this burden by offering admissible evidence sufficient for the trier of fact to conclude that plaintiff was terminated because of poor performance indicated by

---

[5]It is noted that, in large part, plaintiff relied on the decision in Kenny v. Swift Transp., Inc., 347 F.3d 1041 (8th Cir. 2003), for the proposition that a simple denial of facts asserted by the opposing party is sufficient to defeat summary judgment. Plaintiff's reliance is misplaced, for in Kenny, the facts permitted a finding that the plaintiff established a prima facie case. There was a conflict of recollection as to whether that plaintiff had been advised to complete a document in a particular manner. This was critical to the adverse action and a fact-finder was needed to resolve the conflict.

11

repeated recording discrepancies of medication. Erenberg, at 1032. This stated reason provides a legitimate non-discriminatory reason for plaintiff's termination.

Nevertheless, plaintiff is afforded an "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Erenberg, at 1032; St. Mary's, at 507-08. In attempting to prove that defendant's stated reason was pretext, plaintiff is required to set forth evidence establishing that the real reason was unlawful discrimination or retaliation. Erenberg, at 1032.

In so doing, plaintiff relies on the arguments set forth in attempting to establish her prima facie case, as well as Barrett's comment that "people sell drugs." Plaintiff also relies on the drug test conducted on her in support of her allegation of race discrimination. As previously noted, plaintiff failed to satisfy her burden to make out a prima facie case of race discrimination; this would include her assertion that Barrett's comment was sufficiently indicative of racial animus. As to the drug test, it is undisputed that rather than a condition set forth by defendant, it was plaintiff herself who requested the test. Consequently, plaintiff fails to show that defendant's proffered reason for terminating her was due to unlawful discrimination.

C.  **Retaliation**

To establish a prima facie case of retaliation, the plaintiff must show that she engaged in protected conduct; suffered an adverse employment action; and the adverse action was causally linked to the protected conduct. It is unclear what protected conduct plaintiff claims to have engaged in or even if the retaliation issue remains in dispute. Defendant states, and plaintiff does not dispute that in her letter dated August 19, 2003, in which she complained of her termination, she did not

12

allege disparate treatment or discrimination due to race. (Supporting Suggestions: ¶ 50). In an unfair labor charge filed with the National Labor Relations Board, plaintiff did not allege race discrimination, but rather, she alleged termination in retaliation for union activities; this was repeated in affidavits submitted in support of her charge. (Id: ¶¶ 51-52). Labor activities are not the subject of the Civil Rights legislation on which she relies.[6]

Plaintiff's claim that she and fellow co-workers discussed her complaints of race discrimination by Putman is also unpersuasive. There is no development of a theory that co-worker discussions were known to management. Davidson, 416 F.Supp.2d at 694 (a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation).

In sum, plaintiff's claim that race had to play a part in the decision to terminate her employment is insufficient to meet her burden of showing the existence of a genuine issue of material fact. McAninch v. Federal Express Corp., 398 F.Supp.2d 1025, 1039 (S.D.Iowa 2005); quoting, Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000).

---

[6]If the case had been tried, the claim of hostility toward union activity would, of course, severely damage the claim that plaintiff's race was the cause of her termination.

13

Case 4:05-cv-00148-HFS   Document 31   Filed 08/30/06   Page 13 of 14

Accordingly, it is hereby

ORDERED that defendant's motion for summary judgment (ECF doc. 19) is GRANTED.

The clerk of the court is directed to enter judgment in favor of defendant.

    /s/ Howard F. Sachs
    HOWARD F. SACHS
    UNITED STATES DISTRICT JUDGE

August 30, 2006

Kansas City, Missouri